**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro hac vice forthcoming)*
Max S. Roberts (*Pro hac vice)*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRIYA SIDHU, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE PHARMACEUTICALS INC.,<br><br>Defendant. | Case No. 5:22-cv-1603-BLF<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Beth Labson Freeman |

Plaintiff Priya Sidhu ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Bayer Healthcare Pharmaceuticals Inc. ("Defendant" or "Bayer"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based upon personal knowledge.

## NATURE OF THE ACTION

### I. Defendant Failed To Warn Plaintiff, Class Members, And Their Doctors That Using The Mirena IUD Would Result In A Statistically Significant Increased Risk Of Breast Cancer

1. This is a putative class action lawsuit on behalf of purchasers of Bayer's Mirena intrauterine devices (the "Mirena IUD," "Mirena," or the "Product"). Defendant markets and sells the Products as suitable for use as birth control, but Mirena IUDs are not suitable for that use because they increase the risk of breast cancer in users by a statistically significant amount of approximately 20-30%.

2. The Mirena IUD is a "hormonal intrauterine device," specifically a "levonorgestrel-releasing intrauterine system" ("LNG-IUS"). The Mirena IUD is inserted into a woman's uterus, whereupon it releases the hormone progestin. Progestin thickens mucus in the cervix to stop sperm from reaching or fertilizing an egg and thins the lining of the uterus and partially suppresses ovulation, which reduces the chances of pregnancy and decreases menstrual bleeding.

3. Defendant does note on its website that "Mirena isn't right for everyone" and that "[a]n important part of your decision [to use the Product] is making sure you're aware of possible side effects."[1] But conspicuously absent from the list of "safety considerations" is any mention of the statistically significantly increased risk of breast cancer caused by the Product.

[1] SAFETY CONSIDERATIONS FOR MIRENA, https://www.mirena-us.com/mirena-side-effects-and-safety.

4. Bayer's packaging for the Product does not disclose that it significantly increases the risk of breast cancer:




5. Nor do any of the other materials that Defendant distributes to consumers or doctors mention that the Product significantly increases the risk of breast cancer.

6. On the contrary, Defendant represents the opposite to doctors and patients. Specifically, Defendant's prescribing information for Mirena states that "[w]omen who *currently have* or *have had* breast cancer, or *have a suspicion of* breast cancer, should not use hormonal contraception because some breast cancers are hormone-sensitive." ECF No. 17-3, at 14 (emphasis added). But for women like Plaintiff who did not currently have or previously have breast cancer, or who had no suspicion of breast cancer, Defendant tells doctors and patients that "[o]bservational studies of the risk of breast cancer with use of a LNG-releasing IUS *do not provide conclusive evidence of increased risk*." *Id.* (emphasis added). Likewise, Defendant's

website provides a warning only for women who already have, or might have, cancer.[2] Prior to 2015, Defendant went a step further, telling doctors and patients in Mirena's prescribing information that "[t]wo observational studies *have not provided evidence* of an increased risk of breast cancer during the use of Mirena." ECF No. 17-9, at 57 (emphasis added).

7. In other words, Defendant has long told patients and doctors in materials distributed to both that there is no risk of breast cancer associated with the Products where the patient did not currently have or previously have breast cancer, or who had no suspicion of breast cancer.

8. Defendant provided no other warnings to Plaintiff, Class Members, or their doctors that Mirena use would lead to a statistically significant increased risk of breast cancer.

## II. Studies Show That Using The Mirena IUD Results In A Statistically Significant Increased Risk Of Breast Cancer

9. Contrary to Defendant's representations to doctors and patients, studies point to a statistically significant increased risk of breast cancer among Mirena users. Specifically, Mirena users have approximately 20-30% excess risk for breast cancer as compared with non-users of hormonal contraceptives. And, despite its knowledge of these studies, Defendant failed to update the FDA with this newly acquired information, or to otherwise update the Products' warnings.

10. In 2010, a case-control study compared 329 women users of LNG-IUS with 708 controls of the same age.[3] The study showed an increased risk for breast cancer for post-menopausal women in the LNG-IUS population with an odds rate of 1.53 at a 95% confidence interval.

11. In 2016, a Finnish study found a statistically significant increase in breast cancer

---

[2] WHO SHOULD NOT USE MIRENA?, https://www.mirena-us.com/.

[3] *See generally* Heli K. Lyytinen, Heli K. et al., *A Case-Control Study On Hormone Therapy As A Risk Factor For Breast Cancer In Finland: Intrauterine System Carries A Risk As Well*, 126 INT'L J. CANCER 483 (2010), https://onlinelibrary.wiley.com/doi/epdf/10.1002/ijc.24738; *see also* ECF No. 17-4.

risk in postmenopausal women using a LNG-IUS such as the Mirena IUD.[4] Specifically, the study found "positive associations with BC risk" at an odds ratio of 1.48 at a 95% confidence interval "when compared to never-users of any hormonal contraceptive."

12. In 2016, a study found that using an LNG-IUS, such as the Product, "is not only related to an excess risk of lobular breast cancer but also, in contrary to previous assumptions, to an excess risk of ductal breast cancer."[5] Specifically, the study examined "women aged 30-49 who had used LNG-IUS," and found that these women

> had an increased risk for both ductal breast cancer [standardized incidence ratio (SIR) 1.20, 95% confidence interval (CI) 1.14–1.25] and for lobular breast cancer (SIR 1.33, 95% CI 1.20–1.46), as compared with the general female population. The highest risk was found in LNG-IUS users who purchased the device at least twice, whose SIR for lobular cancer was 1.73 (95% CI 1.37–2.15).

This study was particularly reliable because it made use of data maintained by the Finnish Cancer Registry (as opposed to volunteers or self-reporting), which avoids any potential bias due to non-responsiveness and allows for the examination of a much larger number of cases than other studies.

13. In 2017, a Danish study found that, among 1.8 million women aged 15 to 49 who used the LNG-IUS intrauterine system, the relative risk of breast cancer was 1.21 at 95% confidence interval.[6]

14. The Mørch study was particularly reliable for a number of reasons. *First*, like the Soini study discussed above, the Mørch study made use of data provided to the Danish Cancer Registry, which avoids any potential bias due to non-responsiveness and allows for the examination of a much larger number of cases than other studies. *See* Mørch at 2230.

---

[4] Sanna Heikkinen et al., *Use Of Exogenous Hormones And The Risk Of Breast Cancer: Results From Self-Reported Survey Data With Validity Assessment*, 27 CANCER CAUSES & CONTROL 249, 249 (2016), https://pubmed.ncbi.nlm.nih.gov/26667320/; *see also* ECF No. 17-5.

[5] Tuuli Soini, et al., *Levonorgestrel-Releasing Intrauterine System and the Risk Of Breast Cancer: A Nationwide Cohort Study*, 55 ACTA ONCOLOGICA 188, 188 (2016), https://www.tandfonline.com/doi/full/10.3109/0284186X.2015.1062538; *see also* ECF No. 17-6.

[6] Lina S. Mørch et al., *Contemporary Hormonal Contraception And The Risk Of Breast Cancer*. 377 NEW ENGLAND J. MED. 2228, 2228 (2017), https://www.nejm.org/doi/full/10.1056/nejmoa1700732; *see also* ECF No. 17-7.

15. *Second*, Mørch compared the risk of breast cancer in women who had used an LNG-IUS device like the Product to "women who had never used hormonal contraception." *Id.* at 2228. This is important because all hormonal contraceptives carry with them at least some risk of breast cancer.[7] Thus, if a study were to compare the increased risk of breast cancer in women use whose used the Product as compared to the *general population*, the results would likely be skewed because most women in the general population use some form of hormonal contraception. By contrast, Mørch examined the increased risk of breast cancer in women who used LNG-IUD products like Mirena to *never-users*, which gives more reliable results of the increased risk. And Mørch found that increased risk to be statistically significant (21%), higher than the risk caused by other forms of birth control.

16. Finally, in 2020, a systematic review of existing studies found that "LNG-IUS users have an increased breast cancer risk regardless of age and indication."[8] Specifically, the Conz meta-analysis found "increased breast cancer risk in LNG-IUS users: for all women, odds ratio (OR) = 1.16 (95% CI 1.06-1.28[)] … for women aged <50 years, OR = 1.12 (95% CI 1.02-1.22[)] … and for women aged ≥50 years, OR = 1.52 (95% CI 1.34-1.72[)]. Conz at 970. The study further emphasized that, regardless of the risk, "it is difficult to believe that LNG-IUS use may be devoid of any oncological risk" and that "[u]sers of LNG-IUS should therefore be aware of these trends." *Id.* at 981.

17. Although certain studies have come to the opposite conclusion, those studies had significant flaws, such as failing to use registry data (which yielded a smaller and more biased

[7] *See, e.g.*, NATIONAL CANCER INSTITUTE, ORAL CONTRACEPTIVES AND CANCER RISK, https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet ("An analysis of data from more than 150,000 women who participated in 54 epidemiologic studies showed that, overall, women who had ever used oral contraceptives had a slight (7%) increase in the relative risk of breast cancer compared with women who had never used oral contraceptives."); *see also* ECF No. 17-13 ("All hormonal contraceptive could slightly raise your odds of breast cancer.").

[8] Livia Conz et al., *Levonorgestrel-Releasing Intrauterine System And Breast Cancer Risk: A Systematic Review And Meta-Analysis*, 99 ACTA OBSTET GYNECOL SCANDINAVIA 970, 971 (2020), https://obgyn.onlinelibrary.wiley.com/doi/epdf/10.1111/aogs.13817; *see also* ECF No. 17-8.

sample size) or compared the increased risk to the general female population (which skews risk analysis because it includes other users of hormonal contraceptives in the comparison group). Other studies were also funded by Defendant, as opposed to neutral third parties. Finally, a 2021 meta-analysis that Defendant relies on included only four studies in the meta-analysis (as opposed to seven in Conz) and *excluded* three studies that had found an increased risk of breast cancer (unlike Conz, which included these studies).[9]

18. The statistically significant increased risk of breast cancer in users of the Product (approximately 20-30%) presents a serious safety hazard that renders the Product unsuitable for its intended purpose. Women should not have to incur a 20-30% increased risk of breast cancer when selecting a birth control product, and neither Plaintiff nor any member of the putative Class would have taken that risk, particularly when safer birth control alternatives are available. Further, although drug products often carry risks, there is a stark difference between, for instance, a product that makes a user feel bloated or nauseous and a product that increases a user's risk of breast cancer by a statistically significant amount. Thus, the statistically significant increased risk of breast cancer caused by Mirena renders it unsafe and unsuitable for its intended purpose.

## III. Defendant Failed To Update The FDA With Newer Studies Showing A Statistically Significant Increased Risk Of Breast Cancer, And Failed To Change The Warning Information For Mirena In Light Of This Newly Acquired Information

19. Based on the increasing evidence of a statistically significant increased risk of breast cancer in users of the Product (20-30%), Defendant should have changed the labeling or prescribing information on the Product to reflect this, or presented this newly acquired information to the FDA to change its labeling to the extent this was required. Defendant did not do so.

20. The Product was first approved for use in the United States in 2000. In the

[9] Fabio R. Silva et al., *Meta-Analysis of Breast Cancer Risk in Levonorgestrel-Releasing Intrauterine System Users*, 21 CLINICAL BREAST CANCER, 497, 502-03 (2021); *see also* ECF No. 17-12.

prescribing information for the Product that is provided to doctors, Defendant included the following language:

> Women who currently have or have had breast cancer, or have a suspicion of breast cancer, should not use hormonal contraception because some breast cancers are hormone-sensitive.

ECF No. 17-3, at 14.

21. As to women who do not currently have or have had breast cancer, or who do not have a suspicion of breast cancer, Defendant has made several updates to the prescribing information distributed to doctors regarding the risk of breast cancer in these women. First, in 2009, and following the publication of a study entitled "European Active Surveillance Study for Intrauterine Devices," Defendant updated the prescribing information to add the following language:

> Spontaneous reports of breast cancer have been received during postmarketing experience with Mirena. Because spontaneous reports are voluntary and from a population of uncertain size, *it is not possible* to use postmarketing data *to reliably estimate the frequency or establish causal relationship to drug exposure*. Two observational studies *have not provided evidence* of an increased risk of breast cancer during the use of Mirena.

ECF No. 17-9, at 56-57 (emphasis added). As noted above, this statement incorrectly told doctors and patients that there is *no increased risk* (or no evidence of increased risk) of breast cancer in women who use Mirena who never had breast cancer or never had a suspicion of having breast cancer.

22. Then, in December 2015, Defendant submitted a Supplemental New Drug Application ("SNDA") to the FDA following the publication of "two new studies addressing the risk of breast cancer in Mirena users." ECF No. 17-9, at 38. The SNDA resulted in an update to the warnings section of the prescribing information provided to doctors, which came to read and still reads:

> *Observational studies of the risk of breast cancer with the use of a LNG-releasing IUS do not provide conclusive evidence of increased risk.*

ECF No. 17-3, at 14 (emphasis added); *see also* ECF No. 17-9, at 38. Again, this told doctors

there is *no evidence of increased risk* of breast cancer in women who use Mirena who never had or never had a suspicion of having breast cancer.

23. Notably, during the submission of its SNDA, Defendant "declined to add" this different language, "stating that the available data do not establish an association between breast cancer and Mirena use in women < 50 years old, and expressing concern that a labeling revision would imply there has been a change in the interpretation of available evidence." ECF No. 17-9, at 38.

24. December 2015 was the last time Defendant submitted an SNDA to the FDA regarding the risks of breast cancer associated with Mirena. Since that time, several studies have come out finding a statistically increased risk of breast cancer (approximately 20-30% : the 2016 Soini study (ECF No. 17-6), the 2017 Mørch study (ECF No. 17-7), and the 2020 Conz meta-analysis (ECF No. 17-8). Each of these studies constitutes "newly acquired information" because they are (i) "data, analyses, or other information [that were] not previously submitted to the [FDA], (ii) are "data derived from new clinical studies … or new analyses of previously submitted data (e.g., meta-analyses)," and (iii) the studies reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b).

25. Despite the fact that each of these studies post-dates Defendant's 2015 SNDA and constitutes "newly acquired information" as alleged above, Defendant did not and has not provided these studies to the FDA for evaluation, did not and has not submitted a new SNDA in light of those studies, and did not and has not taken steps to change its prescription information to provide stronger warnings regarding the statistically significant increased risk of breast cancer from the Product in women of all ages and who have never had any exposure to or suspicion of breast cancer.

26. Defendant is the manufacturer of Mirena and Mirena is under Defendant's exclusive control. Defendant thus could have taken steps to change the labeling of the Product,

with or without FDA approval, based on this newly acquired information to accurately reflect the known or scientifically knowable risk, incidence, symptoms, scope, or severity of breast cancer stemming from Mirena to doctors and patients. Indeed, Defendant had a duty to do so because a change in labeling is warranted "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(6)(i). As alleged above, the studies provide reasonable evidence of a causal association between Mirena and a statistically significant increased risk of breast cancer, and breast cancer is certainly a clinically significant hazard.

27. It is clear Defendant had knowledge of these studies. Defendant, as one of the largest pharmaceutical corporations in the world, reads literature and studies concerning its products. Furthermore, the prescribing language for Mirena and the SNDA indicate that Defendant reviews studies concerning the Product, as Defendant continuously pushes back on the findings of the studies and commented to the FDA about what it believed studies had shown in December 2015. ECF No. 17-9, at 38.

28. Notably, Defendant has a history of directly marketing Mirena to consumers and overstating the benefits while minimizing the Products' risks. For instance, in 2009, the FDA sent a warning letter to Bayer, stating that Bayer's online marketing materials "make representations and/or suggestions about the efficacy of … Mirena [] but fail to communicate *any* risk information."[10] Although this warning letter did not concern the risks of breast cancer, Defendant's conduct has clearly continued.

## IV. Plaintiff And Class Members Were Injured By The Misrepresentations And Omissions Defendant Made To Doctors And Patients

29. The preceding allegations are summarized as follows. *First*, various studies—particularly studies published after December 2015—found a statistically significant increased risk of breast cancer (approximately 20-30%) in women who use LNG-IUD products like

[10] FDA WARNING LETTER, https://www.yumpu.com/en/document/read/48525663/warning-letter-food-and-drug-administration, at 3 (emphasis in original)

Mirena. *Second*, Defendant failed to update its prescribing information, product labeling, or other literature provided to doctors and patients to reflect this "newly acquired information," nor did Defendant bring these newer studies to the FDA's attention in a SNDA. And *third*, Defendant told doctors and patients and has continued to tell doctors and patients in its prescribing information, product labeling, or other literature provided to doctors and patients that there was no evidence of an increased risk of breast cancer in women who have not had breast cancer or do not have a suspicion of breast cancer. As a result of these actions, Mirena users were harmed.

30. As a result of Defendant's conduct, Plaintiff, Class Members, and their doctors were not aware that Mirena carries with it a statistically significant increased risk of breast cancer of approximately 20-30%. Nor did they have a reason to doubt Bayer's statement that there was no evidence of such a risk. Indeed, members of the medical community, including doctors and other healthcare professionals, relied upon the representations and warranties of the Defendant for the use of Mirena in recommending, prescribing, and/or implanting Mirena. Had Plaintiff's and Class Members' doctors known that Mirena carried with it a statistically significant increased risk of breast cancer of 20-30%, or had Defendant disclosed the same to doctors, they would not have prescribed Mirena to Plaintiff. Similarly, had Defendant not misrepresented that there was no evidence of an increased risk of breast cancer in women who have not had breast cancer or do not have a suspicion of breast cancer, Plaintiff's and Class Members' doctors would not have prescribed Mirena to Plaintiff and Class Members.

31. In addition, because Plaintiff's doctors were not told of Mirena's breast cancer risk, they did not inform Plaintiff of that risk. Nor were Plaintiff or Class Members aware of that risk independently doctors because Defendant's marketing materials—such as in patient brochures and on Mirena's website—did warn about that risk. Instead, Defendant told Plaintiff and Class Members through its marketing materials not to take the Product *only if* the patient

previously had or currently have breast cancer.[11] Plaintiff and Class Members would not have purchased or used the Product had Defendant not misrepresented the risk of breast cancer associated with Mirena, or failed to disclos those risks to doctors and/or patients.

32. In short, therefore, Defendant did not provide doctors prescribing Mirena with adequate warnings and instructions concerning the use of Mirena. Doctors therefore did not have sufficient information to properly inform Plaintiff and Class Members of the risks and dangers associated with the Mirena, specifically the statistically significant increased risk of breast cancer (approximately 20-30%). Plaintiff and Class Members therefore did not have the same knowledge as Defendant because no adequate warning was communicated to them or their doctors, and doctors thus did not warn their patients.

33. As a direct and proximate result of the Defendant's advertising and widespread promotional activity, doctors, including Plaintiff's and Class Member's doctors, began prescribing Mirena as safe and effective without warning patients or being aware themselves of the statistically significant increased risk of breast cancer.

34. Defendant knew or should have known that doctors, including Plaintiff's and Class Members' doctors, began commonly prescribing Mirena as a safe and effective contraceptive, despite the fact that Mirena had been linked to a statistically significant increased risk of breast.

35. Plaintiff and Class Members thus suffered monetary damages as a result of Defendant's deceptive and fraudulent misrepresentations and omissions to doctors and patients alike.

36. Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) breach of implied warranty; (ii) unjust enrichment; (iii) fraud; (iv) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (v) violation of California's Consumers Legal Remedies Act ("CLRA"),

[11] SAFETY CONSIDERATIONS FOR MIRENA, https://www.mirena-us.com/mirena-side-effects-and-safety

Civil Code §§ 1750, *et. seq.*; and (vi) violation of California's False Advertising Law ("FAL"), Cal. Bus & Prof Code §§ 17500, *et seq*.

**PARTIES**

37. Plaintiff Priya Sidhu is a resident and citizen of San Jose, California. Between February 2019 and February 2022, Ms. Sidhu was prescribed and used the Mirena IUD in California. Ms. Sidhu paid $50 out-of-pocket for the Mirena IUD. Ms. Sidhu's doctor who prescribed Mirena to her was not aware of the statistically significant increased risk of breast cancer (approximately 20-30%) caused by Mirena, nor did Defendant inform Ms. Sidhu's doctor of that risk. Instead, Ms. Sidhu's doctor reviewed the prescribing information, product pamphlet, and other materials provided by Defendant, which stated there that there was no evidence of an increased risk of breast cancer for women like Ms. Sidhu who never had breast cancer, nor ever had a suspicion of having breast cancer, and did not have a family history of breast cancer. *See, e.g.*, ECF No. 17-3, at 14. Because Ms. Sidhu's doctor was not told by Defendant of the statistically significant increased risk of breast cancer caused by Mirena—and, in fact, was told by Defendant there was no such increased risk—and was not otherwise aware of this increased risk, Ms. Sidhu's doctor never conveyed any warnings to Ms. Sidhu and prescribed Mirena to Ms. Sidhu based on Defendant's representations and omissions in the information Defendant provided to Ms. Sidhu's doctor.

38. Further, upon first using the Mirena IUD, Ms. Sidhu received and reviewed the patient brochure distributed by Defendant, which did not disclose the statistically significant increased risk of developing breast cancer from using the Mirena IUD. Instead, as with Ms. Sidhu's doctor, Defendant's marketing materials failed to disclose any risk of breast cancer for women like Ms. Sidhu who never had breast cancer, nor ever had a suspicion of having breast cancer. Ms. Sidhu relied on Defendant's representations and warranties in deciding to pay for and use the Mirena IUD, as well as the fact that Ms. Sidhu's doctor did not tell her and was not otherwise aware of any increased risk of breast cancer associated with Mirena. Accordingly,

Defendant's representations and warranties were part of the basis of the bargain, in that Ms. Sidhu would not have paid for the Mirena IUD had Defendant not failed to disclose the statistically significant increased risk of developing breast cancer from using the Mirena IUD. Similarly, had Defendant not mispresented to Ms. Sidhu's doctor there was no evidence of an increased risk of breast cancer from using Mirena for patients who never had breast cancer, and had Defendant not failed to disclose to Ms. Sidhu's doctor the statistically significant increased risk of developing breast cancer from using the Mirena IUD, Ms. Sidhu's doctor would not have prescribed or instructed Ms. Sidhu to use Mirena. At no time did Defendant or anyone else warn Ms. Sidhu or her doctor about the significantly elevated breast cancer risk associated with the Product.

39. Defendant Bayer Healthcare Pharmaceuticals Inc. is a Delaware corporation with its headquarters at 100 Bayer Boulevard, Whippany, New Jersey 07981. Bayer markets, distributes, sells, and makes the Product available for prescription throughout the United States and the State of California, and provides the same prescribing information and marketing materials to doctors who prescribe Mirena throughout the United States and the State of California.

## JURISDICTION AND VENUE

40. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.

41. This Court has personal jurisdiction over Defendant because Plaintiff was prescribed and used the Product in California and Defendant conducts substantial business within California, such that Defendant has significant, continuous, and pervasive contacts within the State of California.

42. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and because Plaintiff was prescribed and used the Product in this District.

## CLASS ALLEGATIONS

43. Plaintiff seeks to represent a class defined as all persons in the United States who were prescribed and used the Mirena IUD (the "Nationwide Class").

44. Plaintiff also seeks to represent a class defined as all persons who reside in the state of California and who were prescribed and used the Mirena IUD (the "California Subclass") (collectively with the Nationwide Class, the "Class").

45. Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

46. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

47. **Numerosity.** The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class. Although the precise number of Class Members is unknown to Plaintiff, the true number of Class Members is known by Defendant and may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

48. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the Product manufactured, distributed, and sold by Defendant subjected consumers to a statistically significantly increased risk (approximately 20-30%) of developing breast cancer, thereby breaching implied warranties made by Defendant and making the Product unfit for its intended purpose;

(b) whether Defendant knew or should have known that the Product subjected consumers to a statistically significantly increased risk (approximately 20-30%) of developing breast cancer prior to selling the Product, thereby constituting fraud and/or fraudulent omission;

(c) whether Defendant is liable to Plaintiff and the Class for unjust enrichment;

(d) whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss;

(e) whether Plaintiff and the Class are entitled to declaratory and injunctive relief;

(f) whether Plaintiff and the Class are entitled to restitution and disgorgement from Defendant; and

(g) whether the marketing, advertising, packaging, labeling, and other promotional materials for Product are deceptive.

49. **Typicality.** The claims of the representative Plaintiff is typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, was prescribed and used the Product, and Defendant misrepresented or otherwise failed to disclose to both Plaintiff and her doctor the statistically significantly increased risk (approximately 20-30%) of developing breast cancer. The representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in the very same way as the members of the Class. Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

50. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff have no interests that are antagonistic to those of the Class.

51. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

52. In the alternative, the Class may also be certified because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**CAUSES OF ACTION**

**COUNT I**
**Breach Of Implied Warranty Of Merchantability**

53. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

55. This claim is brought under the laws of the State of California.

56. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Product was suited for use as a birth control device and that it would not cause a statistically significantly increased risk (approximately 20-30%) of developing breast cancer. Defendant breached the warranty implied in the contract for the sale of the Product because the Product could not "pass without objection in the trade under the contract description," the Product was not "of fair average quality within the description," the Product was not "adequately contained, packaged, and labeled as the agreement may require," and the Product did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

57. Plaintiff and Class Members purchased the Product in reliance upon Defendant's skill and judgment.

58. The Product was not altered by Plaintiff and Class Members.

59. The Product was not fit for its intended purpose when it left the exclusive control of Defendant because the Product carried with it statistically significantly increased risk (approximately 20-30%) of developing breast cancer. This risk constitutes an unreasonable safety hazard for consumers, particularly when other, safer birth control options are available.

60. Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

61. The Product was defectively designed and unfit for its intended purpose, and Plaintiff and Class Members did not receive the Product as warranted. Defendant should have designed Mirena in such a way that it largely minimized or eliminated the risk of breast cancer, and the Product should not have been released given that it carries a statistically significantly increased risk (approximately 20-30%) of developing breast cancer.

62. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's breach because (i) they would not have purchased the Product if they had known that the Product carried with it a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product , and (ii) their doctors would not have prescribed the Product had Defendant not misrepresented there was no "evidence" or "conclusive evidence" of this risk, and had Defendant not failed to disclose there was a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product.

63. On February 1, 2022, prior to the filing of this action, Defendant was served with a notice letter on behalf of Plaintiff and the Class that complied in all respects with U.C.C. §§ 2-313 and 2-607. Plaintiff's counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as **Exhibit 1**.

**COUNT II**
**Unjust Enrichment**

64. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

66. This claim is brought under the laws of the State of California.

67. Plaintiff and the Class conferred a benefit on Defendant in the form of monies paid to purchase the Product.

68. Defendant voluntarily accepted and retained this benefit.

69. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for the Product while misrepresenting or failing to disclose the statistically significantly increased risk (approximately 20-30%) of developing breast cancer, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

**COUNT III**
**Fraud**

70. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

71. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

72. This claim is brought under the laws of the State of California.

73. As discussed above, Defendant failed to disclose to Plaintiff and Class Members that the Product carried with it a statistically significantly increased risk (approximately 20-30%) of developing breast cancer. Likewise, Defendant misrepresented to doctors that there was no "evidence" or "conclusive evidence" of an increased risk of developing breast cancer in women who never had breast cancer, and failed to disclose to doctors that there is a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product.

74. Defendant had knowledge of these misrepresentations omissions and therefore acted with scienter. Specifically, several studies documenting the statistically significantly increased risk (approximately 20-30%) of developing breast cancer associated with the Product have been published since 2010. Nonetheless, Defendant continued to sell the Product without disclosing the same to Plaintiff and Class Members, who used the Product without knowledge of this statistically significantly increased risk. Similarly, Defendant failed to disclose this risk to

doctors, while also misrepresenting to doctors there was no evidence of an increased risk of developing breast cancer in women who never had breast cancer. Further, Defendant was capable of altering the labeling and warnings for the Product, with or without FDA approval. The studies published after 2015 constituted "newly acquired information" that Defendant should have used to change its labeling and warnings or brought to the FDA's attention in a SNDA for evaluation, but Defendant never did either. Thus, Plaintiff's and Class Members' doctors prescribed and continue to prescribe Mirena to patients without knowledge of this statistically significantly increased risk.

75. The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiff and Class Members and their doctors reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class Members to purchase and use the Product, and to induce doctors to prescribe the Product to their patients.

76. Defendant had a duty to disclose the significantly increased risk of developing breast cancer to Plaintiff and Class Members, and Plaintiff's and Class Members' doctors, because (i) Defendant had superior knowledge of material facts not known to Plaintiff and Class Members and their doctors, (ii) Defendant actively concealed this material fact from Plaintiff and Class Members and their doctors, and (iii) Defendant made partial representations to Plaintiff and Class Members and their by representing some of the risks that the Mirena IUD carries with it, but not the statistically significantly increased risk (approximately 20-30%) of developing breast cancer, or the risk posed to women who never had or never had a suspicion of having breast cancer.

77. The fraudulent actions of Defendant caused damage to Plaintiff and Class Members, who are entitled to damages and other legal and equitable relief as a result.

78. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**California Business and Professions Code §§ 17200 *et seq*.**

79. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

80. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

81. By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

82. Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, FAL, and by committing fraud, unjust enrichment, and breaching implied warranties, as alleged herein.

83. Defendant has also committed "unlawful" acts by violating the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.* (the "Sherman Act"). Specifically, the Sherman Act prohibits the sale of misbranded drugs and devices. "Any drug or device is misbranded if its labeling is false or misleading in any particular." Sherman Act, Health & Safety Code § 111330. "'Device' means any instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, that is … [i]ntended for use in the diagnosis of disease or other condition, or in the cure, mitigation, treatment, or prevention of disease in humans or any other animal." *Id.* § 109920(b). Here, the Mirena IUD fits within the definition of a "device" and is "misbranded" because its labeling—specifically, the prescribing information and representations on the website—is false and misleading, in that it misrepresents or otherwise fails to disclose the statistically significant increased risk (approximately 20-30%) of developing breast cancer to doctors and patients. Therefore, the labeling of the Mirena IUD is violative of the Sherman Act and the unlawful provision of the UCL by extension.

84. Defendant's acts and practices described above also violate the UCL's

proscription against engaging in fraudulent conduct. As more fully described above, Defendant's failure to disclose to doctors and patients that the Product carries with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer, as well as Defendant's misrepresentations that there is no evidence of the increased risk of breast cancer, is likely to deceive reasonable consumers and doctors, and cause consumers to purchase and use the Mirena IUD and doctors to prescribe the Mirena IUD when they otherwise would not.

85. Plaintiff and California Subclass Members suffered a substantial injury by virtue of purchasing the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair omissions about the statistically significant increased risk (approximately 20-30%) of developing breast cancer. Similarly, Plaintiff and California Subclass Members would not have paid for or used Mirena had their doctors been aware of these risks. However, their doctors were not aware of these risks because Defendant failed to disclose to doctors that the Product carries with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer, and Defendant misrepresented to doctors that there is no evidence of the increased risk of breast cancer. Had Defendant not made such misrepresentations and omissions, doctors would not have prescribed Mirena, and/or Plaintiff and California Subclass Members would not have purchased and used Mirena.

86. There is no benefit to consumers or competition from misrepresenting and failing to disclose to consumers, doctors, and even the FDA the risk of developing breast cancer associated with the Product.

87. Plaintiff and California Subclass Members had no way of reasonably knowing that the Product they purchased and used carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer. Similarly, doctors and other healthcare professionals had no way of reasonably knowing that the Product they prescribed carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer.

This is especially true where, as here, Defendant represented to doctors the opposite: there is no evidence of the increased risk of breast cancer. Thus, Plaintiff and California Subclass Members could not have reasonably avoided the injury each of them suffered, and doctors could not have reasonably avoided prescribing Mirena because this risk associated with the Product was not known to them.

88. The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the California Subclass.

89. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See*, *e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

90. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

91. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard

that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements. Further, the "unlawful" prong of the UCL is the only way for Plaintiff to vindicate violations of the Sherman Act because the Sherman Act contains no private right of action.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**COUNT V**
**Violation of California's Consumers Legal Remedies Act**
**California Civil Code §§ 1750, *et seq.***

92. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

93. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

94. Defendant is a "person," as defined by California Civil Code § 1761(c).

95. Plaintiff and California Subclass Members are "consumers," as defined by California Civil Code § 1761(d).

96. The Product purchased and used by the Plaintiff and California Subclass Members are "goods" as defined by California Civil Code § 1761(a).

97. The purchases by the Plaintiff and California Subclass Members constitute "transactions," as defined by California Civil Code § 1761(e).

98. The unlawful methods, acts or practices alleged herein to have been undertaken

by Defendant were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Defendant did not result from a *bona fide* error notwithstanding the use of reasonable procedures adopted to avoid such error.

99. Defendant's methods, acts and/or practices, including Defendant's misrepresentations omissions, active concealment, and/or failures to disclose, violated and continue to violate the CLRA in ways including, but not limited to, the following:

(a) Defendant misrepresented that its products had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

(b) Defendant misrepresented that its products were of a particular standard, quality, grade, or of a particular style or model when the products were of another (Cal. Civ. Code § 1770(a)(7)); and

(c) Defendant advertised its products with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)).

100. Specifically, Defendant (i) misrepresented to doctors that there was no "evidence" or "conclusive evidence" of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) failed to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product, and (iii) failed to disclose to Plaintiff and California Subclass Members that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product.

101. Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (i) Defendant had superior knowledge of material information that was not known to Plaintiff, the California Subclass, and their doctors; (ii) Defendant concealed material information from Plaintiff, the California Subclass, and their doctors; and/or (iii) Defendant made partial representations to Plaintiff, the California Subclass, and their doctors, which were false and misleading absent the omitted information.

102. Defendant's misrepresentations and nondisclosures deceive and have a tendency and ability to deceive the general public and doctors who prescribe Mirena.

103. Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information Defendant failed to disclose and would have acted differently had Defendant disclosed the statistically significantly increased risk (~20-30% on average) of developing of breast cancer.

104. Similarly, Defendant's misrepresentations and nondisclosures are material, in that a reasonable doctor would attach importance to the information Defendant failed to disclose and would have acted differently had Defendant disclosed the statistically significantly increased risk (approximately 20-30%) of developing breast cancer.

105. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiff and the California Subclass suffered injury-in-fact and lost money.

106. But for Defendant's omissions of material facts, Plaintiff and the California Subclass would not have purchased and used the Product. Similarly, but for Defendant's misrepresentations and omissions of material facts, Plaintiff's and the California Subclass's doctors would not have prescribed the Product.

107. Defendant's conduct as alleged herein caused substantial injury to Plaintiff, California Subclass Members, and the public.

108. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See*, *e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

109. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928)

("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

110. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the CLRA entail few elements.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

111. On February 1, 2022, more than thirty days prior to the commencement of an action under this section, Defendant was served with a notice letter on behalf of Plaintiff and the California Subclass that complied in all respects with Cal. Civ. Code § 1782. Plaintiff's counsel sent Defendant a letter advising Defendant of the specific acts and practices it committed in violation of the CLRA, and which particular sections of CLRA Defendant breach. Plaintiff's counsel also demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as **Exhibit 1**.

**COUNT VI**
**Violation of California's False Advertising Law**
**California Business and Professions Code §§ 17500, *et seq.***

112. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

113. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

114. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

115. Defendant committed acts of false advertising, as defined by §17500, by (i) misrepresenting to doctors that there was no evidence of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) failing to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product, and (iii) failing to disclose to Plaintiff and California Subclass Members that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product..

116. Defendant knew, or should have known through the exercise of reasonable care, that its misrepresentations and failure to disclose this material fact was substantially likely to mislead to consumers and doctors.

117. Defendant's actions in violation of § 17500 were false and misleading such that the general public and doctors are and were likely to be deceived.

118. Plaintiff and the California Subclass lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Product on the same

terms if they knew the Product carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer; and (b) the Product did not have the characteristics as promised by Defendant. Further, Plaintiff's and California Subclass Members' doctors would not have prescribed Mirena—and therefore, Plaintiff and California Subclass Members would not have purchased or used Mirena—had Defendant (i) not misrepresented to doctors that there was no evidence of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) not failed to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product

119. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See*, *e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

120. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

121. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution

even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the FAL entail few elements.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the nationwide Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 10, 2023

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro hac vice forthcoming)*
Max S. Roberts (*Pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1. I am counsel for Plaintiff, and I am a partner at Bursor & Fisher, P.A. I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2. The complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) because a substantial part of the events or omissions giving rise to these claims occurred in this District.

I declare under the penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on February 10, 2023 in Walnut Creek, California.

*/s/ L. Timothy Fisher*
L. Timothy Fisher

**EXHIBIT 1**

BURSOR & FISHER
P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

JOSHUA D. ARISOHN
Tel: 646.837.7103
Fax: 212.989.9163
jarisohn@bursor.com

February 1, 2022

***Via Certified Mail - Return Receipt Requested***

Bayer U.S. LLC
100 Bayer Boulevard
Whippany, New Jersey 07981

*Re: Notice and Demand Letter Pursuant to U.C.C. § 2-607; Cal. Civ. Code § 1782; N.Y. Gen. Bus. Law §§ 349 and 350; and all other relevant state and local laws*

To Whom It May Concern,

This letter serves as a preliminary notice and demand for corrective action by Bayer U.S. LLC ("Bayer" or "You") pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties – and violations of state consumer protection laws, including but not limited to subsections (a)(5), (7), and (9) of the Consumers Legal Remedies Act, Civil Code § 1770 and New York General Business Law §§ 349 and 350 – related to our clients, Priya Sidhu and Casey Overton, and a class of all similarly situated purchasers (the "Class") of defective and falsely labeled Mirena intrauterine device ("Mirena IUD" or the "Product") manufactured and sold by Bayer.

Ms. Sidhu first purchased the Mirena IUD in California in February 2019, and has continued to use the Product since that time. Ms. Sidhu pays $50 out of pocket each time she purchases the Product. Likewise, Ms. Overton first purchased the Mirena IUD in New York in April 2015, and continued to do so until October 2020. Ms. Overton paid $25-30 out of pocket each time she purchased the Product. Although both Ms. Sidhu and Ms. Overton received marketing materials (*i.e.*, a pamphlet from You) when they purchased the Product, the materials failed to warn Ms. Sidhu and Ms. Overton that the Product carried with it an increased risk of breast cancer. Yet the risk was prominently there. A recent study found that patients using the Product have a have a 20% increased risk of developing breast cancer.[1] Had you disclosed this fact, Ms. Sidhu and Ms. Overton would not have purchased the Product, or would have paid significantly less for it, based on the incumbent risk of developing breast cancer.

In short, our clients and the Class overpaid for the Product based on your failure to disclose the heightened risk of developing breast cancer. Your failure to disclose these material facts constitutes a breach of the express and implied warranties made to our clients and the Class regarding the quality and safety of the Mirena IUDs they purchased. *See* U.C.C. §§ 2-313, 2-314.

---

[1] Tuuli Soini et al., *Levonorgestrel-Releasing Intrauterine System and the Risk Of Breast Cancer: A Nationwide Cohort Study*, 55 ACTA ONCOLOGICA 188 (2016), https://www.tandfonline.com/doi/full/10.3109/0284186X.2015.1062538

This letter also serves as notice of violation of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. You violated the CLRA by (1) representing that the Product had certain characteristics that it did not have, in violation of Cal. Civ. Code § 1770(5); (2) representing that the Product was of a certain standard or quality when it was not, in violation of Cal. Civ. Code § 1770(7); and (3) advertising the Product with an intent not to sell it as advertised, in violation of Cal. Civ. Code § 1770(9). As a result of Your violation of the California Consumers Legal Remedies Act, Ms. Sidhu sustained injury.

Finally, this letter serves as notice of violation of the New York General Business Law ("GBL") §§ 349 and 350, and all other relevant state and local laws. You violated GBL §§ 349 and 350 by failing to disclose that the Product carried with it a heightened risk of breast cancer. You knew or should have known about these facts. As a result of Your violation of the GBL §§ 349 and 350, Ms. Overton and a subclass of all purchasers of the Product in New York sustained injury and are entitled to statutory damages of $550 per violation.

On behalf of our clients and the Class, we hereby demand that You immediately make full restitution to all purchasers of the defective and falsely labeled Mirena IUDs of all purchase money obtained from sales thereof, in addition to statutory damages as appropriate.

We also demand that You preserve all documents and other evidence which refers or relates to any of the above-described practices including, but not limited to, the following:

1. All documents concerning the packaging, labeling, and manufacturing process for the Mirena IUDs;

2. All documents concerning the design, development, supply, production, extraction, and/or testing of the Mirena IUDs;

3. All tests of the Mirena IUDs;

4. All documents concerning the pricing, advertising, marketing, and/or sale of the Mirena IUDs;

5. All communications with customers involving complaints or comments concerning the Mirena IUDs;

6. All documents concerning communications with any pharmacy or physician involved in the marketing or sale of the Mirena IUDs;

7. All documents concerning communications with federal or state regulators;

8. All documents concerning any testing or screening for the increased risk of breast cancer stemming from the Mirena IUDs; and

9. All documents concerning the total revenue derived from sales of the Mirena IUDs.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter. If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

Joshua Arisohn

**EXHIBIT 2**

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro hac vice forthcoming)*
Max S. Roberts (*Pro hac vice)*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

Style Definition: Heading 2: Indent: Left: 0", Right: 0.5", Space Before: 6 pt

Formatted: Footer distance from edge: 0.2"

Deleted: *forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRIYA SIDHU, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE PHARMACEUTICALS INC.,<br><br>Defendant. | Case No. 5:22-cv-1603-BLF<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Beth Labson Freeman |

Deleted: U.S. LLC,

Deleted:

Plaintiff Priya Sidhu ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Bayer Healthcare Pharmaceuticals Inc. ("Defendant" or "Bayer"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based upon personal knowledge.

**Formatted:** Footer distance from edge: 0.2"

**Deleted:** U.S. LLC

## NATURE OF THE ACTION

**Formatted:** No underline

### I. Defendant Failed To Warn Plaintiff, Class Members, And Their Doctors That Using The Mirena IUD Would Result In A Statistically Significant Increased Risk Of Breast Cancer

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 24 pt

1. This is a putative class action lawsuit on behalf of purchasers of Bayer's Mirena intrauterine devices (the "Mirena IUD," "Mirena," or the "Product"). Defendant markets and sells the Products as suitable for use as birth control, but Mirena IUDs are not suitable for that use because they increase the risk of breast cancer in users by a statistically significant amount of approximately 20-30%.

**Deleted:** "

**Deleted:** significantly

**Deleted:** .

2. The Mirena IUD is a "hormonal intrauterine device," specifically a "levonorgestrel-releasing intrauterine system" ("LNG-IUS"). The Mirena IUD is inserted into a woman's uterus, whereupon it releases the hormone progestin. Progestin thickens mucus in the cervix to stop sperm from reaching or fertilizing an egg and thins the lining of the uterus and partially suppresses ovulation, which reduces the chances of pregnancy and decreases menstrual bleeding.

3. Defendant does note on its website that "Mirena isn't right for everyone" and that "[a]n important part of your decision [to use the Product] is making sure you're aware of possible side effects."[1] But conspicuously absent from the list of "safety considerations" is any mention of the statistically significantly increased risk of breast cancer caused by the Product.

[1] SAFETY CONSIDERATIONS FOR MIRENA, https://www.mirena-us.com/mirena-side-effects-and-safety.

4. Bayer's packaging for the Product does not disclose that it significantly increases the risk of breast cancer:




5. Nor do any of the other materials that Defendant distributes to consumers or doctors mention that the Product significantly increases the risk of breast cancer.

6. On the contrary, Defendant represents the opposite to doctors and patients. Specifically, Defendant's prescribing information for Mirena states that "[w]omen who *currently have* or *have had* breast cancer, or *have a suspicion of* breast cancer, should not use hormonal contraception because some breast cancers are hormone-sensitive." ECF No. 17-3, at 14 (emphasis added). But for women like Plaintiff who did not currently have or previously have breast cancer, or who had no suspicion of breast cancer, Defendant tells doctors and patients that "[o]bservational studies of the risk of breast cancer with use of a LNG-releasing IUS *do not provide conclusive evidence of increased risk*." *Id.* (emphasis added). Likewise, Defendant's

**Deleted:** Likewise, the

**Deleted:** of

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 24 pt

**Deleted:** <#>But Defendant has long known that the Product significantly increases the risk of breast cancer.¶

website provides a warning only for women who already have, or might have, cancer.[2] Prior to 2015, Defendant went a step further, telling doctors and patients in Mirena's prescribing information that "[t]wo observational studies *have not provided evidence* of an increased risk of breast cancer during the use of Mirena." ECF No. 17-9, at 57 (emphasis added).

7. In other words, Defendant has long told patients and doctors in materials distributed to both that there is no risk of breast cancer associated with the Products where the patient did not currently have or previously have breast cancer, or who had no suspicion of breast cancer.

8. Defendant provided no other warnings to Plaintiff, Class Members, or their doctors that Mirena use would lead to a statistically significant increased risk of breast cancer.

## II. Studies Show That Using The Mirena IUD Results In A Statistically Significant Increased Risk Of Breast Cancer

9. Contrary to Defendant's representations to doctors and patients, studies point to a statistically significant increased risk of breast cancer among Mirena users. Specifically, Mirena users have approximately 20-30% excess risk for breast cancer as compared with non-users of hormonal contraceptives. And, despite its knowledge of these studies, Defendant failed to update the FDA with this newly acquired information, or to otherwise update the Products' warnings.

10. In 2010, a case-control study compared 329 women users of LNG-IUS with 708 controls of the same age.[3] The study showed an increased risk for breast cancer for post-menopausal women in the LNG-IUS population with an odds rate of 1.53 at a 95% confidence interval.

11. In 2016, a Finnish study found a statistically significant increase in breast cancer

[2] WHO SHOULD NOT USE MIRENA?, https://www.mirena-us.com/.

[3] *See generally* Heli K. Lyytinen, Heli K. et al., *A Case-Control Study On Hormone Therapy As A Risk Factor For Breast Cancer In Finland: Intrauterine System Carries A Risk As Well*, 126 INT'L J. CANCER 483 (2010), https://onlinelibrary.wiley.com/doi/epdf/10.1002/ijc.24738; *see also* ECF No. 17-4.

Formatted: Line spacing: Exactly 24 pt

Formatted: Bullets and Numbering

Deleted: 2015

Formatted: Font: Italic

Deleted: .

risk in postmenopausal women using a LNG-IUS such as the Mirena IUD.[4] Specifically, the study found "positive associations with BC risk" at an odds ratio of 1.48 at a 95% confidence interval "when compared to never-users of any hormonal contraceptive."

12. In 2016, a study found that using an LNG-IUS, such as the Product, "is not only related to an excess risk of lobular breast cancer but also, in contrary to previous assumptions, to an excess risk of ductal breast cancer."[5] Specifically, the study examined "women aged 30-49 who had used LNG-IUS," and found that these women

> had an increased risk for both ductal breast cancer [standardized incidence ratio (SIR) 1.20, 95% confidence interval (CI) 1.14–1.25] and for lobular breast cancer (SIR 1.33, 95% CI 1.20–1.46), as compared with the general female population. The highest risk was found in LNG-IUS users who purchased the device at least twice, whose SIR for lobular cancer was 1.73 (95% CI 1.37–2.15).

This study was particularly reliable because it made use of data maintained by the Finnish Cancer Registry (as opposed to volunteers or self-reporting), which avoids any potential bias due to non-responsiveness and allows for the examination of a much larger number of cases than other studies.

13. In 2017, a Danish study found that, among 1.8 million women aged 15 to 49 who used the LNG-IUS intrauterine system, the relative risk of breast cancer was 1.21 at 95% confidence interval.[6]

14. The Mørch study was particularly reliable for a number of reasons. *First*, like the Soini study discussed above, the Mørch study made use of data provided to the Danish Cancer Registry, which avoids any potential bias due to non-responsiveness and allows for the

[4] Sanna Heikkinen et al., *Use Of Exogenous Hormones And The Risk Of Breast Cancer: Results From Self-Reported Survey Data With Validity Assessment*, 27 CANCER CAUSES & CONTROL 249, 249 (2016), https://pubmed.ncbi.nlm.nih.gov/26667320; *see also* ECF No. 17-5.

[5] Tuuli Soini, et al., *Levonorgestrel-Releasing Intrauterine System and the Risk Of Breast Cancer: A Nationwide Cohort Study*, 55 ACTA ONCOLOGICA 188, 188 (2016), https://www.tandfonline.com/doi/full/10.3109/0284186X.2015.1062538; *see also* ECF No. 17-6.

[6] Lina S. Mørch et al., *Contemporary Hormonal Contraception And The Risk Of Breast Cancer*. 377 NEW ENGLAND J. MED. 2228, 2228 (2017), https://www.nejm.org/doi/full/10.1056/nejmoa1700732; *see also* ECF No. 17-7.



**Deleted:** .
**Deleted:** patients
**Deleted:** have a significantly elevated
**Deleted:** developing
**Deleted:** .
**Deleted:** found that
**Deleted:** the
**Formatted:** Justified, Space Before: 6 pt
**Deleted:** ¶
According to the study, "[t]he results imply that intrauterine administration of levonorgestrel is not only related to an excess risk of lobular breast cancer but also, in contrary to previous assumptions, to an excess risk of ductal breast cancer."¶
**Formatted:** Line spacing: Exactly 24 pt
**Formatted:** Bullets and Numbering
**Deleted:** In
**Deleted:** /.
**Deleted:** Tuuli

examination of a much larger number of cases than other studies. *See* Mørch at 2230.

15. *Second*, Mørch compared the risk of breast cancer in women who had used an LNG-IUS device like the Product to "women who had never used hormonal contraception." *Id.* at 2228. This is important because all hormonal contraceptives carry with them at least some risk of breast cancer.[7] Thus, if a study were to compare the increased risk of breast cancer in women use whose used the Product as compared to the *general population*, the results would likely be skewed because most women in the general population use some form of hormonal contraception. By contrast, Mørch examined the increased risk of breast cancer in women who used LNG-IUD products like Mirena to *never-users*, which gives more reliable results of the increased risk. And Mørch found that increased risk to be statistically significant (21%), higher than the risk caused by other forms of birth control.

16. Finally, in 2020, a systematic review of existing studies found that "LNG-IUS users have an increased breast cancer risk regardless of age and indication."[8] Specifically, the Conz meta-analysis found "increased breast cancer risk in LNG-IUS users: for all women, odds ratio (OR) = 1.16 (95% CI 1.06-1.28[]) … for women aged <50 years, OR = 1.12 (95% CI 1.02-1.22[]) … and for women aged ≥50 years, OR = 1.52 (95% CI 1.34-1.72[]). Conz at 970. The study further emphasized that, regardless of the risk, "it is difficult to believe that LNG-IUS use may be devoid of any oncological risk" and that "[u]sers of LNG-IUS should therefore be aware of these trends." *Id.* at 981.

17. Although certain studies have come to the opposite conclusion, those studies had

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

**Deleted:** <#>Plaintiff and Class Members purchased the Product designed, marketed, manufactured, distributed, and sold by Defendant. Plaintiff and Class Members relied on Defendant's representations concerning the Product, including Defendant's specific enumeration of risks that the Product carried. Plaintiff and Class members would not have purchased the Product—or, at minimum, would have paid significantly less for the Product—had Defendant disclosed that the Product carried with it a significantly elevated risk of breast cancer.¶

[7] *See, e.g.*, NATIONAL CANCER INSTITUTE, ORAL CONTRACEPTIVES AND CANCER RISK, https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet ("An analysis of data from more than 150,000 women who participated in 54 epidemiologic studies showed that, overall, women who had ever used oral contraceptives had a slight (7%) increase in the relative risk of breast cancer compared with women who had never used oral contraceptives."); *see also* ECF No. 17-13 ("All hormonal contraceptive could slightly raise your odds of breast cancer.").

[8] Livia Conz et al., *Levonorgestrel-Releasing Intrauterine System And Breast Cancer Risk: A Systematic Review And Meta-Analysis*, 99 ACTA OBSTET GYNECOL SCANDINAVIA 970, 971 (2020), https://obgyn.onlinelibrary.wiley.com/doi/epdf/10.1111/aogs.13817; *see also* ECF No. 17-8.

significant flaws, such as failing to use registry data (which yielded a smaller and more biased sample size) or compared the increased risk to the general female population (which skews risk analysis because it includes other users of hormonal contraceptives in the comparison group). Other studies were also funded by Defendant, as opposed to neutral third parties. Finally, a 2021 meta-analysis that Defendant relies on included only four studies in the meta-analysis (as opposed to seven in Conz) and *excluded* three studies that had found an increased risk of breast cancer (unlike Conz, which included these studies).[9]

18. The statistically significant increased risk of breast cancer in users of the Product (approximately 20-30%) presents a serious safety hazard that renders the Product unsuitable for its intended purpose. Women should not have to incur a 20-30% increased risk of breast cancer when selecting a birth control product, and neither Plaintiff nor any member of the putative Class would have taken that risk, particularly when safer birth control alternatives are available. Further, although drug products often carry risks, there is a stark difference between, for instance, a product that makes a user feel bloated or nauseous and a product that increases a user's risk of breast cancer by a statistically significant amount. Thus, the statistically significant increased risk of breast cancer caused by Mirena renders it unsafe and unsuitable for its intended purpose.

**III. Defendant Failed To Update The FDA With Newer Studies Showing A Statistically Significant Increased Risk Of Breast Cancer, And Failed To Change The Warning Information For Mirena In Light Of This Newly Acquired Information**

19. Based on the increasing evidence of a statistically significant increased risk of breast cancer in users of the Product (20-30%), Defendant should have changed the labeling or prescribing information on the Product to reflect this, or presented this newly acquired information to the FDA to change its labeling to the extent this was required. Defendant did not do so.

---

[9] Fabio R. Silva et al., *Meta-Analysis of Breast Cancer Risk in Levonorgestrel-Releasing Intrauterine System Users*, 21 CLINICAL BREAST CANCER, 497, 502-03 (2021); *see also* ECF No. 17-12.

20. The Product was first approved for use in the United States in 2000. In the prescribing information for the Product that is provided to doctors, Defendant included the following language:

> Women who currently have or have had breast cancer, or have a suspicion of breast cancer, should not use hormonal contraception because some breast cancers are hormone-sensitive.

ECF No. 17-3, at 14.

21. As to women who do not currently have or have had breast cancer, or who do not have a suspicion of breast cancer, Defendant has made several updates to the prescribing information distributed to doctors regarding the risk of breast cancer in these women. First, in 2009, and following the publication of a study entitled "European Active Surveillance Study for Intrauterine Devices," Defendant updated the prescribing information to add the following language:

> Spontaneous reports of breast cancer have been received during postmarketing experience with Mirena. Because spontaneous reports are voluntary and from a population of uncertain size, *it is not possible* to use postmarketing data *to reliably estimate the frequency or establish causal relationship to drug exposure*. Two observational studies *have not provided evidence* of an increased risk of breast cancer during the use of Mirena.

ECF No. 17-9, at 56-57 (emphasis added). As noted above, this statement incorrectly told doctors and patients that there is *no increased risk* (or no evidence of increased risk) of breast cancer in women who use Mirena who never had breast cancer or never had a suspicion of having breast cancer.

22. Then, in December 2015, Defendant submitted a Supplemental New Drug Application ("SNDA") to the FDA following the publication of "two new studies addressing the risk of breast cancer in Mirena users." ECF No. 17-9, at 38. The SNDA resulted in an update to the warnings section of the prescribing information provided to doctors, which came to read and still reads:

> *Observational studies of the risk of breast cancer with the use of a LNG-releasing IUS do not provide conclusive evidence of increased risk.*

ECF No. 17-3, at 14 (emphasis added); *see also* ECF No. 17-9, at 38. Again, this told doctors there is *no evidence of increased risk* of breast cancer in women who use Mirena who never had or never had a suspicion of having breast cancer.

23. Notably, during the submission of its SNDA, Defendant "declined to add" this different language, "stating that the available data do not establish an association between breast cancer and Mirena use in women < 50 years old, and expressing concern that a labeling revision would imply there has been a change in the interpretation of available evidence." ECF No. 17-9, at 38.

24. December 2015 was the last time Defendant submitted an SNDA to the FDA regarding the risks of breast cancer associated with Mirena. Since that time, several studies have come out finding a statistically increased risk of breast cancer (approximately 20-30% : the 2016 Soini study (ECF No. 17-6), the 2017 Mørch study (ECF No. 17-7), and the 2020 Conz meta-analysis (ECF No. 17-8). Each of these studies constitutes "newly acquired information" because they are (i) "data, analyses, or other information [that were] not previously submitted to the [FDA], (ii) are "data derived from new clinical studies … or new analyses of previously submitted data (e.g., meta-analyses)," and (iii) the studies reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b).

25. Despite the fact that each of these studies post-dates Defendant's 2015 SNDA and constitutes "newly acquired information" as alleged above, Defendant did not and has not provided these studies to the FDA for evaluation, did not and has not submitted a new SNDA in light of those studies, and did not and has not taken steps to change its prescription information to provide stronger warnings regarding the statistically significant increased risk of breast cancer from the Product in women of all ages and who have never had any exposure to or suspicion of breast cancer.

26. Defendant is the manufacturer of Mirena and Mirena is under Defendant's

exclusive control. Defendant thus could have taken steps to change the labeling of the Product, with or without FDA approval, based on this newly acquired information to accurately reflect the known or scientifically knowable risk, incidence, symptoms, scope, or severity of breast cancer stemming from Mirena to doctors and patients. Indeed, Defendant had a duty to do so because a change in labeling is warranted "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(6)(i). As alleged above, the studies provide reasonable evidence of a causal association between Mirena and a statistically significant increased risk of breast cancer, and breast cancer is certainly a clinically significant hazard.

27. It is clear Defendant had knowledge of these studies. Defendant, as one of the largest pharmaceutical corporations in the world, reads literature and studies concerning its products. Furthermore, the prescribing language for Mirena and the SNDA indicate that Defendant reviews studies concerning the Product, as Defendant continuously pushes back on the findings of the studies and commented to the FDA about what it believed studies had shown in December 2015. ECF No. 17-9, at 38.

28. Notably, Defendant has a history of directly marketing Mirena to consumers and overstating the benefits while minimizing the Products' risks. For instance, in 2009, the FDA sent a warning letter to Bayer, stating that Bayer's online marketing materials "make representations and/or suggestions about the efficacy of … Mirena [] but fail to communicate *any* risk information."[10] Although this warning letter did not concern the risks of breast cancer, Defendant's conduct has clearly continued.

**IV. Plaintiff And Class Members Were Injured By The Misrepresentations And Omissions Defendant Made To Doctors And Patients**

29. The preceding allegations are summarized as follows. *First*, various studies—

[10] FDA WARNING LETTER, https://www.yumpu.com/en/document/read/48525663/warning-letter-food-and-drug-administration, at 3 (emphasis in original)

particularly studies published after December 2015—found a statistically significant increased risk of breast cancer (approximately 20-30%) in women who use LNG-IUD products like Mirena. *Second*, Defendant failed to update its prescribing information, product labeling, or other literature provided to doctors and patients to reflect this "newly acquired information," nor did Defendant bring these newer studies to the FDA's attention in a SNDA. And *third*, Defendant told doctors and patients and has continued to tell doctors and patients in its prescribing information, product labeling, or other literature provided to doctors and patients that there was no evidence of an increased risk of breast cancer in women who have not had breast cancer or do not have a suspicion of breast cancer. As a result of these actions, Mirena users were harmed.

30. As a result of Defendant's conduct, Plaintiff, Class Members, and their doctors were not aware that Mirena carries with it a statistically significant increased risk of breast cancer of approximately 20-30%. Nor did they have a reason to doubt Bayer's statement that there was no evidence of such a risk. Indeed, members of the medical community, including doctors and other healthcare professionals, relied upon the representations and warranties of the Defendant for the use of Mirena in recommending, prescribing, and/or implanting Mirena. Had Plaintiff's and Class Members' doctors known that Mirena carried with it a statistically significant increased risk of breast cancer of 20-30%, or had Defendant disclosed the same to doctors, they would not have prescribed Mirena to Plaintiff. Similarly, had Defendant not misrepresented that there was no evidence of an increased risk of breast cancer in women who have not had breast cancer or do not have a suspicion of breast cancer, Plaintiff's and Class Members' doctors would not have prescribed Mirena to Plaintiff and Class Members.

31. In addition, because Plaintiff's doctors were not told of Mirena's breast cancer risk, they did not inform Plaintiff of that risk. Nor were Plaintiff or Class Members aware of that risk independently doctors because Defendant's marketing materials—such as in patient brochures and on Mirena's website—did warn about that risk. Instead, Defendant told Plaintiff

and Class Members through its marketing materials not to take the Product *only if* the patient previously had or currently have breast cancer.[11] Plaintiff and Class Members would not have purchased or used the Product had Defendant not misrepresented the risk of breast cancer associated with Mirena, or failed to disclos those risks to doctors and/or patients.

32. In short, therefore, Defendant did not provide doctors prescribing Mirena with adequate warnings and instructions concerning the use of Mirena. Doctors therefore did not have sufficient information to properly inform Plaintiff and Class Members of the risks and dangers associated with the Mirena, specifically the statistically significant increased risk of breast cancer (approximately 20-30%). Plaintiff and Class Members therefore did not have the same knowledge as Defendant because no adequate warning was communicated to them or their doctors, and doctors thus did not warn their patients.

33. As a direct and proximate result of the Defendant's advertising and widespread promotional activity, doctors, including Plaintiff's and Class Member's doctors, began prescribing Mirena as safe and effective without warning patients or being aware themselves of the statistically significant increased risk of breast cancer.

34. Defendant knew or should have known that doctors, including Plaintiff's and Class Members' doctors, began commonly prescribing Mirena as a safe and effective contraceptive, despite the fact that Mirena had been linked to a statistically significant increased risk of breast.

35. Plaintiff and Class Members thus suffered monetary damages as a result of Defendant's deceptive and fraudulent misrepresentations and omissions to doctors and patients alike.

36. Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) breach of implied warranty; (ii) unjust enrichment; (iii) fraud; (iv) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

[11] SAFETY CONSIDERATIONS FOR MIRENA, https://www.mirena-us.com/mirena-side-effects-and-safety

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

**Deleted:** negligence; (v)

Code §§ 17200, *et seq.*; (v) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; and (vi) violation of California's False Advertising Law ("FAL"), Cal. Bus & Prof Code §§ 17500, *et seq*.

**PARTIES**

37. Plaintiff Priya Sidhu is a resident and citizen of San Jose, California. Between February 2019 and February 2022, Ms. Sidhu was prescribed and used the Mirena IUD in California. Ms. Sidhu paid $50 out-of-pocket for the Mirena IUD. Ms. Sidhu's doctor who prescribed Mirena to her was not aware of the statistically significant increased risk of breast cancer (approximately 20-30%) caused by Mirena, nor did Defendant inform Ms. Sidhu's doctor of that risk. Instead, Ms. Sidhu's doctor reviewed the prescribing information, product pamphlet, and other materials provided by Defendant, which stated there that there was no evidence of an increased risk of breast cancer for women like Ms. Sidhu who never had breast cancer, nor ever had a suspicion of having breast cancer, and did not have a family history of breast cancer. *See, e.g.*, ECF No. 17-3, at 14. Because Ms. Sidhu's doctor was not told by Defendant of the statistically significant increased risk of breast cancer caused by Mirena—and, in fact, was told by Defendant there was no such increased risk—and was not otherwise aware of this increased risk, Ms. Sidhu's doctor never conveyed any warnings to Ms. Sidhu and prescribed Mirena to Ms. Sidhu based on Defendant's representations and omissions in the information Defendant provided to Ms. Sidhu's doctor.

38. Further, upon first using the Mirena IUD, Ms. Sidhu received and reviewed the patient brochure distributed by Defendant, which did not disclose the statistically significant increased risk of developing breast cancer from using the Mirena IUD. Instead, as with Ms. Sidhu's doctor, Defendant's marketing materials failed to disclose any risk of breast cancer for women like Ms. Sidhu who never had breast cancer, nor ever had a suspicion of having breast cancer. Ms. Sidhu relied on Defendant's representations and warranties in deciding to pay for and use the Mirena IUD, as well as the fact that Ms. Sidhu's doctor did not tell her and was not

Deleted: vi
Deleted: vii
Deleted: §
Deleted: ¶
Deleted: and has an intent to remain there, and is therefore a domiciliary of California
Deleted: Upon
Formatted: Line spacing: Exactly 24 pt
Formatted: Bullets and Numbering
Deleted: significantly elevated
Deleted: Ms.
Deleted: purchase

otherwise aware of any increased risk of breast cancer associated with Mirena. Accordingly, Defendant's representations and warranties were part of the basis of the bargain, in that Ms. Sidhu would not have paid for the Mirena IUD had Defendant not failed to disclose the statistically significant increased risk of developing breast cancer from using the Mirena IUD. Similarly, had Defendant not mispresented to Ms. Sidhu's doctor there was no evidence of an increased risk of breast cancer from using Mirena for patients who never had breast cancer, and had Defendant not failed to disclose to Ms. Sidhu's doctor the statistically significant increased risk of developing breast cancer from using the Mirena IUD, Ms. Sidhu's doctor would not have prescribed or instructed Ms. Sidhu to use Mirena. At no time did Defendant or anyone else warn Ms. Sidhu or her doctor about the significantly elevated breast cancer risk associated with the Product.

39. Defendant Bayer Healthcare Pharmaceuticals Inc. is a Delaware corporation with its headquarters at 100 Bayer Boulevard, Whippany, New Jersey 07981. Bayer markets, distributes, sells, and makes the Product available for prescription throughout the United States and the State of California, and provides the same prescribing information and marketing materials to doctors who prescribe Mirena throughout the United States and the State of California.

**JURISDICTION AND VENUE**

40. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.

41. This Court has personal jurisdiction over Defendant because Plaintiff was prescribed and used the Product in California and Defendant conducts substantial business within California, such that Defendant has significant, continuous, and pervasive contacts within the

**Deleted:** she

**Deleted:** purchased

**Deleted:** , or would have paid significantly less for it,

**Deleted:** disclosed that the Mirena IUD carried with it a significantly elevated

**Deleted:** .

**Deleted:** Plaintiff

**Deleted:** physician

**Deleted:** U.S. LLC

**Formatted:** Font color: Auto

**Deleted:** .

**Deleted:** ¶

**Deleted:** <#>Defendant is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant is therefore "a citizen of the State where it has its principal place of business [New Jersey] and the State under whose laws it is organized [Delaware]." *See* 28 U.S.C. § 1332(d)(10).¶

**Deleted:** <#>, was exposed to Defendant's fraudulent omissions in California,

State of California.

42. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and because Plaintiff was prescribed and used the Product in this District.

**CLASS ALLEGATIONS**

43. Plaintiff seeks to represent a class defined as all persons in the United States who were prescribed and used the Mirena IUD (the "Nationwide Class").

44. Plaintiff also seeks to represent a class defined as all persons who reside in the state of California and who were prescribed and used the Mirena IUD (the "California Subclass") (collectively with the Nationwide Class, the "Class").

45. Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

46. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

47. **Numerosity.** The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class. Although the precise number of Class Members is unknown to Plaintiff, the true number of Class Members is known by Defendant and may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

Formatted: Add space between paragraphs of the same style, Line spacing: Exactly 24 pt

Formatted: Line spacing: Exactly 24 pt

Formatted: Bullets and Numbering

Deleted: Upon information and belief,

Deleted: members

Deleted: members

Deleted: members

48. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the Product manufactured, distributed, and sold by Defendant subjected consumers to a statistically significantly increased risk (approximately 20-30%) of developing breast cancer, thereby breaching implied warranties made by Defendant and making the Product unfit for its intended purpose;

(b) whether Defendant knew or should have known that the Product subjected consumers to a statistically significantly increased risk (approximately 20-30%) of developing breast cancer prior to selling the Product, thereby constituting fraud and/or fraudulent omission;

(c) whether Defendant is liable to Plaintiff and the Class for unjust enrichment;

(d) whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss;

(e) whether Plaintiff and the Class are entitled to declaratory and injunctive relief;

(f) whether Plaintiff and the Class are entitled to restitution and disgorgement from Defendant; and

(g) whether the marketing, advertising, packaging, labeling, and other promotional materials for Product are deceptive.

49. **Typicality.** The claims of the representative Plaintiff is typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, was prescribed and used the Product, and Defendant misrepresented or otherwise failed to disclose to both Plaintiff and her doctor the statistically significantly increased risk (approximately 20-30%) of developing breast cancer. The representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in the very same way as the members of the Class. Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

Formatted: List Paragraph, Indent: Left: 1.25", Right: 0.75"

Deleted: elevated

Formatted: Indent: Left: 1.75", First line: 0", Right: 0.75", Line spacing: Exactly 12 pt

Deleted: elevated

Deleted: Defendants

Deleted: ¶

Deleted: Plaintiffs are

Deleted: Classes

Deleted: was not told of

Deleted: by Defendant

50. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff have no interests that are antagonistic to those of the Class.

Deleted: has

51. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

52. In the alternative, the Class may also be certified because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the Defendant;

Formatted: Indent: Left: 1.25", Right: 0.75", Space Before: 6 pt, Add space between paragraphs of the same style, Line spacing: Exactly 12 pt

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Breach Of Implied Warranty Of Merchantability

53. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

55. This claim is brought under the laws of the State of California.

56. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Product was suited for use as a birth control device and that it would not cause a statistically significantly increased risk (approximately 20-30%) of developing breast cancer. Defendant breached the warranty implied in the contract for the sale of the Product because the Product could not "pass without objection in the trade under the contract description," the Product was not "of fair average quality within the description," the Product was not "adequately contained, packaged, and labeled as the agreement may require," and the Product did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

57. Plaintiff and Class Members purchased the Product in reliance upon Defendant's skill and judgment.

58. The Product was not altered by Plaintiff and Class Members.

59. The Product was not fit for its intended purpose when it left the exclusive control of Defendant because the Product carried with it statistically significantly increased risk (approximately 20-30%) of developing breast cancer. This risk constitutes an unreasonable safety hazard for consumers, particularly when other, safer birth control options are available.

60. Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

Formatted: Space After: 6 pt, Line spacing: Exactly 24 pt

Deleted: ¶

Moved down [1]: incorporates by reference the allegations contained in all preceding paragraphs of this complaint.¶ Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.¶

Moved (insertion) [2]

Deleted: ¶ Plaintiff hereby

Formatted: Line spacing: Exactly 24 pt

Formatted: Bullets and Numbering

Deleted: elevated

Deleted: the

Deleted: in properly packaging and labeling the Tests

61. The Product was defectively designed and unfit for its intended purpose, and Plaintiff and Class Members did not receive the Product as warranted. Defendant should have designed Mirena in such a way that it largely minimized or eliminated the risk of breast cancer, and the Product should not have been released given that it carries a statistically significantly increased risk (approximately 20-30%) of developing breast cancer.

62. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's breach because (i) they would not have purchased the Product if they had known that the Product carried with it a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product, and (ii) their doctors would not have prescribed the Product had Defendant not misrepresented there was no "evidence" or "conclusive evidence" of this risk, and had Defendant not failed to disclose there was a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product.

63. On February 1, 2022, prior to the filing of this action, Defendant was served with a notice letter on behalf of Plaintiff and the Class that complied in all respects with U.C.C. §§ 2-313 and 2-607. Plaintiff's counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as **Exhibit 1**.

## COUNT II
## Unjust Enrichment

64. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

66. This claim is brought under the laws of the State of California.

67. Plaintiff and the Class conferred a benefit on Defendant in the form of monies

**Deleted:** elevated

**Deleted:** , and (ii) they overpaid for

**Deleted:** on account

**Deleted:** Defendant's failure

**Deleted:** that the Product carried with it

**Deleted:** elevated

**Formatted:** Space Before: 6 pt, Add space between paragraphs of the same style

**Moved (insertion) [1]**

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

**Deleted:** ¶

**Moved up [2]:** <#>Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.¶
Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.¶

paid to purchase the Product.

68. Defendant voluntarily accepted and retained this benefit.

69. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for the Product while misrepresenting or failing to disclose the statistically significantly increased risk (approximately 20-30%) of developing breast cancer, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

**COUNT III**
**Fraud**

70. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

71. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

72. This claim is brought under the laws of the State of California.

73. As discussed above, Defendant failed to disclose to Plaintiff and Class Members that the Product carried with it a statistically significantly increased risk (approximately 20-30%) of developing breast cancer. Likewise, Defendant misrepresented to doctors that there was no "evidence" or "conclusive evidence" of an increased risk of developing breast cancer in women who never had breast cancer, and failed to disclose to doctors that there is a statistically significantly increased risk (approximately 20-30%) of developing breast cancer from using the Product.

74. Defendant had knowledge of these misrepresentations omissions and therefore acted with scienter. Specifically, several studies documenting the statistically significantly increased risk (approximately 20-30%) of developing breast cancer associated with the Product have been published since 2010. Nonetheless, Defendant continued to sell the Product without disclosing the same to Plaintiff and Class Members, who used the Product without knowledge of this statistically significantly increased risk. Similarly, Defendant failed to disclose this risk to doctors, while also misrepresenting to doctors there was no evidence of an increased risk of

Deleted: elevated
Deleted: unfit for the purpose in which they were sold
Formatted: Space Before: 6 pt
Formatted: Add space between paragraphs of the same style, Line spacing: Exactly 12 pt
Moved (insertion) [3]
Formatted: Line spacing: Exactly 24 pt
Formatted: Bullets and Numbering
Deleted: ¶ Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.¶ Plaintiff brings this
Deleted: individually and on behalf
Deleted: members of the proposed Class against Defendant
Deleted: of
Deleted: significantly increased risk.

developing breast cancer in women who never had breast cancer. Further, Defendant was capable of altering the labeling and warnings for the Product, with or without FDA approval. The studies published after 2015 constituted "newly acquired information" that Defendant should have used to change its labeling and warnings or brought to the FDA's attention in a SNDA for evaluation, but Defendant never did either. Thus, Plaintiff's and Class Members' doctors prescribed and continue to prescribe Mirena to patients without knowledge of this statistically significantly increased risk.

75. The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiff and Class Members and their doctors reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class Members to purchase and use the Product, and to induce doctors to prescribe the Product to their patients.

76. Defendant had a duty to disclose the significantly increased risk of developing breast cancer to Plaintiff and Class Members, and Plaintiff's and Class Members' doctors, because (i) Defendant had superior knowledge of material facts not known to Plaintiff and Class Members and their doctors, (ii) Defendant actively concealed this material fact from Plaintiff and Class Members and their doctors, and (iii) Defendant made partial representations to Plaintiff and Class Members and their by representing some of the risks that the Mirena IUD carries with it, but not the statistically significantly increased risk (approximately 20-30%) of developing breast cancer, or the risk posed to women who never had or never had a suspicion of having breast cancer.

77. The fraudulent actions of Defendant caused damage to Plaintiff and Class Members, who are entitled to damages and other legal and equitable relief as a result.

78. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**California Business and Professions Code §§ 17200 *et seq.***

79. Plaintiff incorporates by reference the allegations contained in all preceding

**Deleted:** exclusive

**Deleted:** elevated

**Formatted:** Space Before: 6 pt, Add space between paragraphs of the same style, Line spacing: Exactly 12 pt

**Moved up [3]:** Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.¶
Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.¶

**Moved down [4]:** COUNT V¶

**Deleted: Negligence¶**
¶

**Deleted:** Defendant, as the designer, manufacturer and distributor of the Product owed Plaintiff and the public a duty to use reasonable care in designing and testing the Mirena IUD.¶
Defendants breached its duty of care owed to Plaintiff and other consumers because it did not use the amount of care in designing and testing the Product that a reasonably careful designer of similar products would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. If Defendant had properly tested the product, it would have discovered that it results in a significantly elevated risk of breast cancer.¶
As a direct and proximate cause of Defendant's negligence, Plaintiff and Class have been injured and harmed in the form of an economic loss. Specifically, had Plaintiff and the Class known that the Product was negligently designed so that it causes a significantly elevated risk of breast cancer, they would not have purchased the Product or only agreed to pay significantly less for it.¶
Page Break
¶

**Deleted:** §

**Deleted:** ¶

**Deleted:** hereby

paragraphs of this complaint.

80. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

81. By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

82. Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, FAL, and by committing fraud, unjust enrichment, and breaching implied warranties, as alleged herein.

**Deleted:** negligence,

83. Defendant has also committed "unlawful" acts by violating the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.* (the "Sherman Act"). Specifically, the Sherman Act prohibits the sale of misbranded drugs and devices. "Any drug or device is misbranded if its labeling is false or misleading in any particular." Sherman Act, Health & Safety Code § 111330. "'Device' means any instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, that is … [i]ntended for use in the diagnosis of disease or other condition, or in the cure, mitigation, treatment, or prevention of disease in humans or any other animal." *Id.* § 109920(b). Here, the Mirena IUD fits within the definition of a "device" and is "misbranded" because its labeling—specifically, the prescribing information and representations on the website—is false and misleading, in that it misrepresents or otherwise fails to disclose the statistically significant increased risk (approximately 20-30%) of developing breast cancer to doctors and patients. Therefore, the labeling of the Mirena IUD is violative of the Sherman Act and the unlawful provision of the UCL by extension.

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

84. Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct. As more fully described above, Defendant's failure to disclose to doctors and patients that the Product carries with it a

statistically significant increased risk (approximately 20-30%) of developing breast cancer, as well as Defendant's misrepresentations that there is no evidence of the increased risk of breast cancer, is likely to deceive reasonable consumers and doctors, and cause consumers to purchase and use the Mirena IUD and doctors to prescribe the Mirena IUD when they otherwise would not.

85. Plaintiff and California Subclass Members suffered a substantial injury by virtue of purchasing the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair omissions about the statistically significant increased risk (approximately 20-30%) of developing breast cancer. Similarly, Plaintiff and California Subclass Members would not have paid for or used Mirena had their doctors been aware of these risks. However, their doctors were not aware of these risks because Defendant failed to disclose to doctors that the Product carries with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer, and Defendant misrepresented to doctors that there is no evidence of the increased risk of breast cancer. Had Defendant not made such misrepresentations and omissions, doctors would not have prescribed Mirena, and/or Plaintiff and California Subclass Members would not have purchased and used Mirena.

86. There is no benefit to consumers or competition from misrepresenting and failing to disclose to consumers, doctors, and even the FDA the risk of developing breast cancer associated with the Product.

87. Plaintiff and California Subclass Members had no way of reasonably knowing that the Product they purchased and used carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer. Similarly, doctors and other healthcare professionals had no way of reasonably knowing that the Product they prescribed carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer. This is especially true where, as here, Defendant represented to doctors the opposite: there is no evidence of the increased risk of breast cancer. Thus, Plaintiff and California Subclass Members

Deleted: significantly
Deleted: the other
Deleted: members
Deleted: buying
Deleted: significantly
Deleted: ,
Deleted: by virtue
Deleted: paying an excessive premium price for the Product as a result
Deleted: Defendant's unlawful, fraudulent, and unfair
Deleted: that the Product carries with it a significantly increased risk of developing breast cancer.¶ Plaintiff
Deleted: other
Deleted: members
Formatted: Line spacing: Exactly 24 pt
Formatted: Bullets and Numbering
Deleted: significantly increased risk of developing breast cancer.
Deleted: they

could not have reasonably avoided the injury each of them suffered, and doctors could not have reasonably avoided prescribing Mirena because this risk associated with the Product was not known to them.

88. The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the California Subclass.

89. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See, e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

90. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

91. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

**Deleted:** Plaintiff, on behalf of herself and the California Subclass, seeks injunctive relief to require Defendant to: (1) provide notice to every class member that the Product carries with it significantly increased risk of developing breast cancer; (2) provide a refund to Plaintiff and the California Subclass for their Product test in an amount to be determined at trial; (3) subsidize the costs of screening for breast cancer for

**Deleted:** . ¶
Defendant's conduct has caused substantial injury to Plaintiff, California Subclass Members, and the public. Defendant's conduct is ongoing and will continue absent a permanent injunction. Accordingly, Plaintiff seeks an order enjoining Defendant from committing such unlawful, unfair, and fraudulent business practices. Plaintiff further seeks an order granting restitution to Plaintiff and the California Subclass members in an amount to be proven at trial. Plaintiff further seeks an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.¶
Plaintiff and the general public lack an

**Deleted:** to

**Formatted:** Font color: Black

**Deleted:** and/or mitigate the totality of the injuries and misconduct described herein.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements. Further, the "unlawful" prong of the UCL is the only way for Plaintiff to vindicate violations of the Sherman Act because the Sherman Act contains no private right of action.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**COUNT V**

**Violation of California's Consumers Legal Remedies Act**

**California Civil Code §§ 1750, *et seq.***

92. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

93. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

94. Defendant is a "person," as defined by California Civil Code § 1761(c).

95. Plaintiff and California Subclass Members are "consumers," as defined by California Civil Code § 1761(d).

96. The Product purchased and used by the Plaintiff and California Subclass Members are "goods" as defined by California Civil Code § 1761(a).

97. The purchases by the Plaintiff and California Subclass Members constitute "transactions," as defined by California Civil Code § 1761(e).

98. The unlawful methods, acts or practices alleged herein to have been undertaken by Defendant were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Defendant did not result from a *bona fide*

Moved (insertion) [4]

Formatted: List Paragraph, Indent: Left: -0.06", Space Before: 6 pt, No widow/orphan control

Deleted: <#>Absent injunctive relief, Defendant will continue to injure Plaintiff and the California Subclass members. Defendant's conduct and omissions of material fact are ongoing. And, even if such conduct were to cease, it is behavior that is capable of repetition or reoccurrence by Defendant yet evades review. ¶
In order to prevent injury to the general public, Plaintiff, in her individual capacity, seeks a public injunction requiring Defendant to disclose to consumers that the Product carries with it a significantly increased risk of developing breast cancer.¶
COUNT VI¶

Deleted: §

Formatted: Add space between paragraphs of the same style, Line spacing: Exactly 12 pt

Formatted: Line spacing: Exactly 24 pt

Formatted: Bullets and Numbering

Deleted: members of the

error notwithstanding the use of reasonable procedures adopted to avoid such error.

99. Defendant's methods, acts and/or practices, including Defendant's misrepresentations omissions, active concealment, and/or failures to disclose, violated and continue to violate the CLRA in ways including, but not limited to, the following:

(a) Defendant misrepresented that its products had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

(b) Defendant misrepresented that its products were of a particular standard, quality, grade, or of a particular style or model when the products were of another (Cal. Civ. Code § 1770(a)(7)); and

(c) Defendant advertised its products with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)).

100. Specifically, Defendant (i) misrepresented to doctors that there was no "evidence" or "conclusive evidence" of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) failed to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product, and (iii) failed to disclose to Plaintiff and California Subclass Members that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product.

101. Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (i) Defendant had superior knowledge of material information that was not known to Plaintiff, the California Subclass, and their doctors; (ii) Defendant concealed material information from Plaintiff, the California Subclass, and their doctors; and/or (iii) Defendant made partial representations to Plaintiff, the California Subclass, and their doctors, which were false and misleading absent the omitted information.

102. Defendant's misrepresentations and nondisclosures deceive and have a tendency and ability to deceive the general public and doctors who prescribe Mirena.

103. Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information Defendant failed to disclose and

**Deleted:** <#>With regard to this count of the pleading which alleges one or more violations of the CLRA, venue is proper in the state or federal court having jurisdiction over Santa Clara County, California (the county in which this action has been commenced) pursuant to Section 1780(d) of the California Civil Code because, without limitation, Santa Clara County is a county in which Defendant is doing business and is the county in which a substantial portion of the events that gave rise to this cause of action occurred. A declaration establishing that this Court has proper venue for this count is attached hereto as **Exhibit 2**.¶

**Formatted:** Justified, Indent: Left: 0.75", Right: 0.75", Space Before: 6 pt

**Deleted:** ¶
Specifically, Defendant failed to disclose that the Product carried with it a significantly increased risk of developing breast cancer.¶

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

**Deleted:** exclusive

**Deleted:** and

**Deleted:** and

would have acted differently had Defendant disclosed the statistically significantly increased risk (~20-30% on average) of developing of breast cancer.

104. Similarly, Defendant's misrepresentations and nondisclosures are material, in that a reasonable doctor would attach importance to the information Defendant failed to disclose and would have acted differently had Defendant disclosed the statistically significantly increased risk (approximately 20-30%) of developing breast cancer.

105. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiff and the California Subclass suffered injury-in-fact and lost money.

106. But for Defendant's omissions of material facts, Plaintiff and the California Subclass would not have purchased and used the Product. Similarly, but for Defendant's misrepresentations and omissions of material facts, Plaintiff's and the California Subclass's doctors would not have prescribed the Product.

107. Defendant's conduct as alleged herein caused substantial injury to Plaintiff, California Subclass Members, and the public.

108. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See, e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

109. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end

**Formatted:** Line spacing: Exactly 24 pt

**Formatted:** Bullets and Numbering

**Deleted:** the Product tests and/or would have paid significantly less for

**Deleted:** Defendant's conduct is ongoing and will continue and recur absent a permanent injunction. Accordingly, Plaintiff and the California Subclass seek an order enjoining Defendant from committing such practices.

**Deleted:** <#>If not enjoined by order of this Court, Defendant will continue to omit crucial information and injure Plaintiff and consumers through the misconduct alleged herein once more. Defendant has a duty to speak truthfully or in a non-misleading manner. ¶
Plaintiff will be harmed if, in the future, they are left to guess as to whether Defendant's representations are accurate and whether there are omissions of material facts regarding the features or specifications of the Product. ¶
In order to prevent injury to the general public, Plaintiff, in her individual capacity, seeks a public injunction requiring Defendant to disclose that the Product carries with it a significantly increased risk of developing breast cancer.¶
The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.¶

in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.”).

110. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the CLRA entail few elements.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law.” RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

111. On February 1, 2022, more than thirty days prior to the commencement of an action under this section, Defendant was served with a notice letter on behalf of Plaintiff and the California Subclass that complied in all respects with Cal. Civ. Code § 1782. Plaintiff's counsel sent Defendant a letter advising Defendant of the specific acts and practices it committed in violation of the CLRA, and which particular sections of CLRA Defendant breach. Plaintiff's counsel also demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as **Exhibit 1**.

**COUNT VI**
**Violation of California's False Advertising Law**
**California Business and Professions Code §§ 17500, *et seq.***

112. Plaintiff incorporates by reference the allegations contained in all preceding

Formatted: Line spacing: Exactly 24 pt
Formatted: Bullets and Numbering
Deleted: VII
Formatted: Space Before: 6 pt, Add space between paragraphs of the same style
Formatted: Add space between paragraphs of the same style
Deleted: §
Formatted: Add space between paragraphs of the same style, Line spacing: Exactly 12 pt
Formatted: Line spacing: Exactly 24 pt
Formatted: Bullets and Numbering

paragraphs of this complaint.

113. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

114. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

115. Defendant committed acts of false advertising, as defined by §17500, by (i) misrepresenting to doctors that there was no evidence of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) failing to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product, and (iii) failing to disclose to Plaintiff and California Subclass Members that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product..

116. Defendant knew, or should have known through the exercise of reasonable care, that its misrepresentations and failure to disclose this material fact was substantially likely to mislead to consumers and doctors.

117. Defendant's actions in violation of § 17500 were false and misleading such that the general public and doctors are and were likely to be deceived.

118. Plaintiff and the California Subclass lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Product on the same terms if they knew the Product carried with it a statistically significant increased risk (approximately 20-30%) of developing breast cancer; and (b) the Product did not have the

**Deleted:** ,

**Deleted:** failing

**Deleted:** disclose

**Deleted:** the Product carries with it a significantly

**Deleted:** .

**Deleted:** is

**Deleted:** was

**Deleted:**

**Deleted:** the true facts were known about the Product; (b) they paid a price premium for the Product due to Defendant's failure to disclose that

**Deleted:** significantly

**Deleted:** c

characteristics as promised by Defendant. Further, Plaintiff's and California Subclass Members' doctors would not have prescribed Mirena—and therefore, Plaintiff and California Subclass Members would not have purchased or used Mirena—had Defendant (i) not misrepresented to doctors that there was no evidence of the increased risk of breast cancer associated with the Product for women who never had or never had a suspicion of having present cancer, (ii) not failed to disclose to doctors that there is a statistically significant increased risk (approximately 20-30%) of developing breast cancer associated with the Product

119. Plaintiff and California Subclass Members have no adequate remedy at law for this claim. Plaintiff pleads her claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Such a finding is not one that can be made on the pleadings. *See, e.g.*, *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022).

120. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

121. Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of

money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims under the FAL entail few elements.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**PRAYER FOR RELIEF**

Formatted: Line spacing: Exactly 24 pt

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the nationwide Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

Formatted: Right: 0.75"

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Deleted: ¶

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Deleted: ¶

Dated: February 10, 2023 Respectfully submitted,

Deleted: March 18, 2022

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro hac vice forthcoming)*
Max S. Roberts (*Pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

Deleted: *forthcoming*

Formatted: Font: Not Italic

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1. I am counsel for Plaintiff, and I am a partner at Bursor & Fisher, P.A. I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2. The complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) because a substantial part of the events or omissions giving rise to these claims occurred in this District.

I declare under the penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on February 10, 2023 in Walnut Creek, California.

*/s/ L. Timothy Fisher*
L. Timothy Fisher